ALVIN J. BRIDEAU, Petitioner, v EDWARD M. WHEELER, Individually and as Chairman of the Board of Police Commissioners of the Village of Ossining, et al., Respondents.

Second Department, January 29, 1982

### APPEARANCES OF COUNSEL

*Alvin J. Brideau,* petitioner *pro se,* and *McGovern, Connelly & Davidson (Charles K. McGoey* of counsel), for Alvin J. Brideau, petitioner.

*Hugh A. Lavery, Jr.,* for respondents.

### OPINION OF THE COURT

COHALAN, J.

Petitioner Alvin J. Brideau, a 14-year veteran of and a lieutenant in the Village of Ossining Police Department, was dismissed from his position on December 9, 1980. He had been found guilty by the Board of Police Commissioners of using excessive physical force on a prisoner being held in custody, in violation of section 3.2.17 of the rules and regulations of the department. That section states that "[a] member of the department shall not use any physical

force on any individual in excess of that required to make an arrest or hold a prisoner in custody."

Brideau commenced a CPLR article 78 proceeding to review the determination. By order dated June 9, 1981, the Supreme Court, Westchester County (BURCHELL, J.), transferred the proceeding to this court pursuant to CPLR 7803 (subd 4) and 7804 (subd [g]). The determination should be annulled and the matter remitted to the Board of Police Commissioners of the Village of Ossining for a new hearing.

Shortly after 1:00 A.M. on September 6, 1980, petitioner Brideau, off duty and in civilian clothes, entered Noah's Ark Bar and Grill. Sometime later, he asked another patron, John Murawski, to stop bothering two young women who were seated at the bar, and also asked him to step outside into the parking lot. Brideau identified himself as a police officer. While outside, the two engaged in a fist fight, although which one started it was in dispute. Eventually, Murawski was pushed by Brideau and fell against a car. Brideau called police headquarters to request that a patrol car be sent to the scene because he was making an arrest. Murawski returned to the bar to retrieve his money and at the same time accosted Brideau while the latter was making a telephone call. This caused a second altercation.

The two eventually went outside again, at which time another off-duty police officer, Sergeant Stevens, told Murawski that Brideau was a police officer and assisted Brideau in making the arrest. While in handcuffs, Murawski twice spat in petitioner's face.

The patrol car arrived in due course. Sergeant Stevens placed the prisoner in the back seat. Officer William Costa, the driver of the police car, and Sergeant Stevens both testified that Murawski was calm. Brideau came out from the bar and entered the vehicle through the same door as Murawski, thereby requiring the latter to move over. It is unclear whether he refused to move over or had difficulty doing so. At that point, in any event, there was contact between Brideau's foot and Murawski's right thigh and hip. Brideau claims he merely pushed Murawski over after

he refused to move, while Officer Costa and his partner, Officer Vallo, supported Murawski's testimony that the contact constituted a kick. At the hearing, Murawski testified that during the one-half mile ride to the police station, Brideau repeatedly kicked and punched him. Officer Costa corroborated this testimony. He stated that through the rearview mirror he saw Brideau grab Murawski by the hair and start punching him, and that he heard the prisoner cry. This was substantiated by Officer Vallo to the extent that he saw Brideau grab Murawski by the hair and cock his arm. Although he did not see any blows land, he heard scuffling, hollering and Murawski crying. Brideau denied that he punched the prisoner, but did concede that in accordance with proper police procedure he pulled his hair and bent his finger in an effort to control him. He claimed the prisoner was attempting to butt and kick him. Officer Boynton, who was driving in another car directly behind Brideau, testified that he saw only heads, no hands, through the rear window of the patrol car.

After Murawski was locked in a cell, Brideau threw a bowl of water at him, although there is conflicting testimony as to the reason for doing so. Brideau testified that it was done in an effort to calm Murawski down. Officer Boynton testified that Brideau said: "The guy spit at my face twice. If I was someone else, I'd probably piss on him. I think I'll make him think that's what I'm doing."

The next day when Murawski was released after being handed an appearance ticket for disorderly conduct, he was observed by Sergeant Sullivan. The sergeant said that he did not see any marks or bruises on him.

There was other testimony to the effect that Murawski was known to be a nasty drunk and Sullivan testified that the prisoner told him, in effect, that he had been "liquored up" the night before.

Petitioner contends that the charges resulted from a conspiracy among Officers Vallo and Costa and Sergeant Stevens to frame him, and that it was Stevens who persuaded Murawski to file a complaint some 13 days after the incident. This was buttressed by the fact that the complaint was not filed until after Stevens spoke to Murawski's girlfriend. There was evidence, too, that Brideau

had brought certain information regarding alleged criminal activities of Officer Vallo, that had been witnessed by Sergeant Stevens and another officer, to the Westchester County District Attorney's office when the Village Police Chief failed to act after Brideau had given him the same information.

This brings us to the issue of evidence not brought to the attention of the Board of Police Commissioners at the hearing.

On September 2, 1980, four days prior to the Noah's Ark incident, a burglary occurred in the village. The police lifted fingerprints at the scene. Comparison with prints on file at local headquarters tentatively identified them as those of none other than John Murawski.

Sergeant Stevens was an active participant in the burglary investigation, but seems to have delayed to an unusual extent in obtaining verification with respect to the fingerprints. The hearing against Brideau was not held until October 27, 28 and 29, 1980. Three weeks is the usual period allotted to verify fingerprints found at the scene of a crime. Not until October 30, however, did Sergeant Stevens request the county's fingerprint expert to issue a verification of the fingerprints as those of Murawski. The official verification was provided by hand delivery to the Ossining Detective Division on November 7. The Board of Police Commissioners, as stated, dismissed Brideau on December 9. Six days later, an information charging Murawski with the burglary was filed and Stevens countersigned it. A warrant was issued the next day (December 16). Murawski surrendered to the police on December 28. He was arraigned on the burglary charge and was released from custody shortly thereafter. He has since disappeared and is currently a fugitive from justice.

Murawski's prior criminal record consisted of possession of burglar's tools and of narcotics implements, both class A misdemeanors. Had Brideau's attorney known of Murawski's burglary involvement, he would have had an even better opportunity to impeach his credibility.

On January 21, 1981, shortly after learning of the facts concerning Murawski's involvement in the September 2, 1980 burglary, Brideau's attorney wrote to the Village

Board in its capacity as the Board of Police Commissioners. The letter included a chronological account of the case, and asked the board to reconsider its decision by making a complete review of the matter, with a view to reinstating Brideau to the force.

On January 22, 1981, the Village Corporation Counsel responded with a letter containing a statement that "in view of the fact that the criminal charges against Mr. Murawski are still pending, it would appear that any action by the Board of Trustees at this time would be precipitous [*sic*] and premature."

A second letter from Brideau's attorney dated January 26, 1981 met with silence. This proceeding followed.

In *Matter of Waterhouse v Hastings* (73 AD2d 1034), the Rochester Police Chief meted out a severe punishment upon Waterhouse, a police officer, following a hearing on specified charges of misconduct. He did so in the mistaken belief that several years before, the petitioner had been suspended for using excessive force in making an arrest. As a result, the court remitted the matter for a new hearing limited solely to the question of punishment.

In *Matter of Sedita v Kissinger* (66 AD2d 357), a woman striker on a picket line resisted arrest. She kicked, hit, scratched and cursed at the petitioner police officer, and threw a cup of hot liquid in his face. He finally brought her to the ground and smothered her body with his own in a successful effort to subdue her. After a hearing, the City Manager imposed a fine upon Sedita for use of excessive force. We annulled the determination because there was no substantial evidence of excessive force.

In *Matter of Romeo v Union Free School Dist., No. 3, Town of Islip* (64 AD2d 664), a superintendent of buildings and grounds was dismissed on charges of incompetence and misconduct. He petitioned the court to vacate the dismissal (p 665) " 'because of the failure and neglect of the Respondent and the Hearing Officer to reveal the professional, family or friendship relationship existing between the Hearing Officer and the late Lee W. Phillips, Director of Administration of the Respondent School District.' " This relationship, which was established by overwhelming evidence, was unknown to Romeo at the time of the hearing.

Phillips had played a primary role in the preparation of the school district's charges. This court remitted the matter for a new hearing. Of the relationship we noted (at p 666) that "[f]undamental fairness requires that prior to undertaking his duties a hearing officer make known any relationship which he may have with any party to the proceeding, and disclose all facts known to him which might indicate any interest or create even the appearance of partiality or bias".

The quotation is singularly appropriate to the instant situation. The Chief of Police and Sergeant Stevens, both of whom testified against Brideau — as well as others within the department — appear to have withheld information about Murawski's fingerprints until after the departmental hearing was concluded, to the obvious detriment of the petitioner. The board itself failed to reopen the hearing when requested to consider evidence allegedly withheld deliberately. Fundamental fairness mandates a new hearing, and we direct the holding of a *de novo* hearing with all convenient speed.

DAMIANI, J. P., LAZER and BRACKEN, JJ., concur.

Petition granted to the extent that the determination of the Board of Police Commissioners, dated December 9, 1980, is annulled, on the law, without costs or disbursements, and the matter is remitted to the respondent board for a *de novo* hearing and determination.